IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LAQUANA PATTERSON**
**ON BEHALF OF L.P.,**                          Case No. 1:16 CV 110
        Plaintiff,

        v.                                  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                      MEMORANDUM OPINION AND ORDER

## INTRODUCTION

LaQuana Patterson ("Patterson") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of her son, L.P. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1383(c). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Patterson first filed an application for SSI on behalf of her son in February 2011. (Tr. 64). An administrative law judge ("ALJ") denied that application in a written decision in March 2012. (Tr. 64-84). In October 2012, Patterson filed a second application for SSI on behalf of Plaintiff, alleging a disability onset date of November 1, 2010. (Tr. 145-53). The claims were denied initially and upon reconsideration. (Tr. 110-12, 116-18). Patterson then requested a hearing before an ALJ. (Tr. 119). On July 3, 2014, Patterson (represented by counsel) appeared and testified in Cleveland, Ohio, at a hearing before the ALJ. (Tr. 39-60). On July 23, 2014, the

ALJ found Plaintiff not disabled in a written decision. (Tr. 16-38). In December 2015, the Appeals Council denied Patterson's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 404.955, 404.981. Patterson filed the instant action on behalf of Plaintiff on January 19, 2016. (Doc. 1).

FACTUAL BACKGROUND

***Educational and Medical Evidence***

> *Prior to the First ALJ Decision*

In December 2009, Plaintiff was referred to Beech Brook by his teacher due to disruptive, aggressive, and hyperactive classroom behavior. (Tr. 399, 410). A mental status examination by social worker Amy Lee revealed decreased impulse control, decreased frustration tolerance, reduced eye contact, psychomotor restlessness, impaired concentration, and impaired ability to focus. (Tr. 409). Plaintiff was assessed with oppositional defiant disorder ("ODD") and attention deficit hyperactivity disorder ("ADHD"). (Tr. 410).

In February 2010, Beech Brook psychiatrist Thomas D. Eppright, M.D., diagnosed Plaintiff with ADHD, and noted a need to rule out a learning disability. (Tr. 329). Dr. Eppright stated Plaintiff had "[s]ignificant impulsivity, distractibility, and hyperactivity". *Id.* He started Plaintiff on a trial of Adderall and recommended Plaintiff continue the school based program through Beech Brook. *Id.*

In February 2011, Patterson reported to social worker Deborah Casciato that Plaintiff had poor academic performance, a short attention span, hyperactivity, impulsivity, and oppositional behavior toward adults. (Tr. 281). Ms. Casciato referred Plaintiff for a mental health assessment with a psychologist. *Id.*

2

In April 2011, Patterson reported medications helped Plaintiff significantly, but she was concerned about his appetite. (Tr. 270). The pediatrician noted he had "consistent weight gain and height velocity" with "[n]o drastic changes" and suggested nutritional supplements, as well as strategies to increase caloric intake. (Tr. 270-71).

Plaintiff's November 2011 treatment plan through Beech Brook contained diagnoses of ODD, ADHD, and a learning disorder not otherwise specified. (Tr. 310). The plan indicated Plaintiff was in first grade, in special education classes, and did not note any disciplinary problems at school. (Tr. 321). Social worker Bridgid Ratcliffe noted Plaintiff had made minimal progress in his goals of expressing feelings appropriately and using coping strategies. (Tr. 323). Although noting minimal progress toward the goals of attending psychiatric assessments and evaluation sessions and receiving medical intervention, Ms. Ratcliffe wrote: "Doing well on meds." *Id.* In summary, she noted: "Overall, we have seen minimal improvement with [Plaintiff]." (Tr. 324).

Also in November 2011, Dr. Eppright noted Plaintiff was "doing well" and medication (Vyvanse) had been beneficial. (Tr. 331).

In a decision dated March 22, 2012, the first ALJ found Plaintiff had severe impairments of ADHD and ODD. (Tr. 67). That ALJ concluded Plaintiff was not disabled because although he had a marked limitation in interacting and relating with others, he had less than marked, or no limitation, in the other functional domains. *See* Tr. 76-84.

*Subsequent to the First ALJ Decision*

Medical Records

In July 2012, Patterson reported to Plaintiff's pediatrician, Sophia Orraca-Tetteh, M.D., that Plaintiff would repeat second grade that year. (Tr. 335). The pediatrician noted Plaintiff was

3

in a program at Beech Brook for ADHD and behavior, and that he was "[r]eceiving therapy and counseling and on one medication and doing well." *Id.*

A Beech Brook review the following month by Kimberly Fuller, LSW, indicated Plaintiff had made minimal progress toward most goals. (Tr. 387-94). She noted "some progress as evidenced by decreased hyperactivity and impulsivity while on medication for the school year" and "minimal progress as evidenced by his ability to use at least 2 coping skills; however, he is unable to use these consistently or without prompting." (Tr. 389). He was noted to be "improved" in his ability to "connect how he is felling to his actions." (Tr. 390). On the parent version of an assessment, Plaintiff's problem severity decreased by thirteen points, and had a six point increase in functioning. (Tr. 391). On the social worker's version, he had a two point increase in problem severity and a nine point increase in functioning. *Id.*

Also in August 2012, Dr. Eppright noted Plaintiff was doing well on his medication and that Patterson was "pleased with response to medication." (Tr. 395). His impression was that Plaintiff was "[m]aking progress". *Id.*

Again in October 2012, Dr. Eppright noted Plaintiff had "been doing quite well" on Vyvanse, despite some appetite decrease. (Tr. 434). Patterson reported the school had noted significant improvement in his ability to concentrate. *Id.* Dr. Eppright recommended Plaintiff skip his medication on the weekends to counteract the decreased appetite side effect. *Id.*

In December 2012, Patterson reported an increase in Plaintiff's ADHD symptoms that both she and the school had noticed. (Tr. 433). Dr. Eppright increased Plaintiff's Vyvanse dosage. *Id.*

A Beech Brook review in January 2013 of Plaintiff's treatment plan indicated continuing diagnoses of ODD, ADHD, and learning disorder. (Tr. 413). Ms. Fuller noted Plaintiff had been

suspended twice in five months for disrupting his class and a fight with peers. (Tr. 424). She noted that he "has only been reported to have significant challenges when in his special education classroom" and that he "has made progress at home, but has continued to have challenges at school with his special education teacher." (Tr. 424-25). Ms. Fuller noted Plaintiff had improved his behavior toward Patterson and his primary education teacher, but "struggles on a daily basis to respect his special education teacher, and as a result has minimally increased his knowledge from the first grade." (Tr. 428). She noted Plaintiff's behavior improved on medication, but the medication appeared to have slowed his thinking process. *Id.*

Later that same month, Dr. Eppright noted "significant improvement" in impulsivity, hyperactivity, and distractibility with the increased Vyvanse dosage, with no side effects. (Tr. 432). Plaintiff told Dr. Eppright he liked school and believed he was making progress. *Id.* Dr. Eppright's impression was Plaintiff was "[d]oing well." *Id.* That same day, Dr. Eppright completed a form indicating Plaintiff had marked limitations in acquiring and using information, caring for self, health and physical well-being, attending and completing tasks, and interacting and relating with others. (Tr. 436-38). He also indicated Plaintiff had a moderate limitation in moving about and manipulating objects. (Tr. 438).

In May 2013, Ms. Fuller completed a questionnaire in which she indicated Plaintiff had marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for self. (Tr. 468-69). She also indicated Plaintiff had moderate limitations in moving about and manipulating objects, and health and physical well-being. (Tr. 469-70). Ms. Fuller noted Plaintiff's medication "sometimes delays his processing of material and verbal output of information." (Tr. 470).

5

In November 2013, Dr. Eppright again completed a questionnaire, this time indicating Plaintiff had extreme limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for self. (Tr. 472-74). He also indicated Plaintiff had a marked limitation in health and physical well-being, and no limitation in moving about and manipulating objects. (Tr. 473-74).

In February 2014, social worker Jasmine Merriweather, LSW, completed a review of Plaintiff's treatment plan for Beech Brook. (Tr. 485-502). Ms. Merriweather noted Patterson reported Plaintiff "is more compliant in being cooperative and following directions" and that calls from the school were less frequent. (Tr. 496). She described minimal progress, noting Plaintiff "continues to show signs of poor cooperation, inability to follow directions, maintaining focus and ge[t]s easily frustrated", but had shown progress in "com[p]liance in cooperation [and] following directions." (Tr. 497).

In March 2014, Plaintiff's pediatrician noted he was "[e]ducationally very challenged" but "[d]oing well [w]ith performance and appetite on [V]yvanse." (Tr. 524).

In April 2014, Dr. Eppright noted Plaintiff was "[d]oing quite well" with "[l]ess impulsivity, distractibility, [and] hyperactivity." (Tr. 503). He noted Patterson was "very pleased" with Plaintiff's progress and that no side effects were noted. *Id.*

In June 2014, Dr. Eppright completed a questionnaire in which he indicated Plaintiff had extreme limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for self, and health and physical well-being. (Tr. 504-06).

Also in June 2014, Ms. Merriweather completed a questionnaire regarding Plaintiff's functioning. (Tr. 261-62). She stated she saw Plaintiff twice per week in school and had known

him for five months. (Tr. 261). Plaintiff was in third grade, but Ms. Merriweather opined his functional level was at the second grade level, and noted he receives "K-2" work from teachers. *Id.* She noted low attention span, difficulty concentrating, "at times" trouble following directions, issues with working independently, difficulty understanding and completing assignments, difficulty learning skills involved in reading, writing, and mathematics, and issues interacting with peers. (Tr. 261-62).

<u>Education Records</u>

In March 2012, an individualized education program (IEP) annual review was conducted. (Tr. 219-30). Plaintiff was in the first grade and had "made some progress" during the year. (Tr. 220). His NWEA math test scores in problem solving, number sense, computation, measurement, statistics and algebra were "in the range of below average." *Id.* His math calculation and math reasoning skills were at a "mid kindergarten level". (Tr. 223). Additionally, "he [was] unable to build on his basic math skills because he ha[d] not yet mastered the fundamental skills that underline higher order functioning" and he was "still easily frustrated" and had "difficulty doing grade level work." *Id.* His reading test score was also below average, with his test performance "comparable to that of an average Kindergartener." *Id.* Plaintiff "could complete class work most of the time", but the deficits in his reading skills "continue[d] to interfere with his acquisition of information and in the content areas." *Id.* The IEP contained accommodations of small group instruction, extended time, frequent breaks, and a teacher reading the questions and instructions on tests. (Tr. 228).

An August 2012 reading test noted Plaintiff read eleven words per minute, with five errors, and read a total of six words correctly. (Tr. 169-70). A handwritten note at the top of the page indicates: "no medicine taken today." (Tr. 169). A progress report from an open house

indicates Plaintiff was receiving satisfactory ratings in reading, English/writing, and math (with his special education teacher). (Tr. 171). He was receiving an A in science, a B in social studies, and an F in spelling. *Id.*

September 2012 standardized test scores show low scores in math and reading. (Tr. 172-73). Plaintiff was suspended for three days in October 2012 for fighting with a peer. (Tr. 167-68). Plaintiff's grades at the end of the first marking period were Ds in English/Language arts and mathematics, an A in social studies, and Bs in science and music. (Tr. 215).

In November 2012, Plaintiff's second grade teacher Kimberly Buchanan filled out a teacher questionnaire. (Tr. 180-88). She indicated Plaintiff's instructional level for reading, math, and written language was "Kindergarten" on one page (Tr. 180), and "late 1st grade" on another (Tr. 188). She indicated Plaintiff had problems in the area of acquiring and using information, including very serious problems in reading and comprehending written material and expressing ideas in written form. (Tr. 181). She noted he "has great difficulty doing independent work" and that "[h]is work is shortened and modified." *Id.* Ms. Buchanan also indicated Plaintiff had problems in the area of attending and completing tasks, notably serious problems in focusing, carrying out multi-step instructions, working without distracting self or others, and working at a reasonable pace. (Tr. 182). Ms. Buchanan also found Plaintiff had problems interacting and relating with others, but noted only slight problems in various areas within the category, and stated that he "does a good job overall when interacting and relating with others as long as he takes his medicine for ADHD." (Tr. 183). Ms. Buchanan thought Plaintiff had no difficulty with moving about or manipulating objects and some problems in the area of caring for himself. (Tr. 184-85). Ms. Buchanan noted that Plaintiff was "focused when he takes his medicine. When he does not have it, he is a behavior problem." (Tr. 186).

8

In December 2012, Intervention Specialist Helen Bandor noted that "[o]nce [Plaintiff] is in a good mood he is able to pay attention in class" but that "[h]e has a hard time to complete class work because he is very slow in doing his work and he always tries to make sure his work looks perfect." (Tr. 189).

In January 2013, Ms. Buchanan completed a questionnaire in which she indicated Plaintiff was in a second grade classroom, but was "working at a Kindergarten/first grade level." (Tr. 195). She noted Plaintiff's IEP which permitted him extra time, modified lessons, directions to be read to him, and small group instruction with a special education teacher. *Id.* She again noted Plaintiff was easily distracted and disruptive when not on his medication. (Tr. 195-96) ("He works well when on the medication. When [Plaintiff] does not have his medication, his behavior is bad, he has trouble concentrating, or following directions."). He had difficulty with attention span, following directions, and working independently. (Tr. 195). She noted it took Plaintiff a long time to complete assignments and that he was "a slow worker." *Id.*

Again in May 2013, Ms. Buchanan indicated Plaintiff was "functioning at a Kindergarten level" and that he received accommodations such as extra time and lesson modification. (Tr. 213). She indicated his attention span, ability to follow instructions, ability to work independently, ability to understand and complete assignments on time, ability to respond to changes of routine, ability to respond to criticism, and ability to progress in reading, writing and mathematics were all "poor" and "below grade level". *Id.* Again, Ms. Buchanan noted Plaintiff's behavior suffered when he did not take his ADHD medication. (Tr. 214). Plaintiff was easily distracted, a slow worker, and needed many reminders to complete his work. *Id.*

In October 2013, Plaintiff received an out-of-school suspension. (Tr. 259). In October and November 2013, he also received in-school suspensions. *Id.*

Plaintiff's IEP was reviewed in March 2014 when he was in the third grade. (Tr. 241-55). It noted his test scores in reading and math placed him in the "limited" range. (Tr. 242, 245, 246). He liked going to school and "[got] along with his peers most of the time." *Id.* His reading was below the first grade level ("He can not read independently himself") and his math level was "at the beginning of the second grade level." *Id.* He struggled specifically with his writing, and was unable to "write complete short simple sentences himself." (Tr. 243). When in a good mood, Plaintiff tried to focus in class and was able to pay attention to his teacher. *Id.* However, when he was not in a good mood, he was disruptive and disrespectful toward teachers and peers. *Id.* The IEP concluded Plaintiff still needed accommodations and special education. (Tr. 252-53).

In April 2014, Plaintiff received two out-of-school suspensions for fighting, running from security, inappropriate language, and disrupting the classroom. (Tr. 367, 37, 259).

Plaintiff's report card for the first three marking periods of the 2013-2014 school year (third grade) showed Ds in English/Language Arts and mathematics, and Cs in English/Language Arts Intervention. (Tr. 238). He received Ds in social studies and science for the first two marking periods, and Cs in the third marking period. *Id.* He received Bs in visual arts for the first two marking periods. *Id.* The report card also indicated Plaintiff's placement for the following year was promotion to fourth grade. *Id.*

State Agency Reviewers

In December 2012, state agency pediatrician Janice Taylor, M.D., and psychologist Aracelis Rivera, Psy.D., reviewed Plaintiff's file. (Tr. 90-98). They concluded Plaintiff had less than marked limitations in acquiring and using information (noting Plaintiff received special education due to ADHD and needs one-on-one help), attending and completing tasks, and caring for oneself. (Tr. 94-95). They also concluded Plaintiff had no limitation in health and physical

well-being or moving about and manipulating objects. (Tr. 95). In so doing, they applied Social Security Acquiescence Ruling 98-4(6), and adopted the findings of the March 2012 ALJ decision when rating Plaintiff's functioning. (Tr. 94-96).

In April 2013, state agency pediatrician Robert Klinger, M.D., and psychologist Jennifer Swain, Psy.D., reviewed Plaintiff's file on behalf of the state agency and reached the same conclusions as the earlier review. (Tr. 104-09).

***Hearing Testimony and Personal Background.***

Plaintiff was eight years old and in the second grade at the time Patterson filed his application. (Tr. 145, 177). He was ten years old at the time of the hearing. (Tr. 54).

At the hearing, Patterson testified Plaintiff's reading and spelling were his main problems. (Tr. 43). She said Plaintiff's "grades go up and down" and that he is suspended every other month for fighting with other students, teachers, or security guards. (Tr. 44). He was in both special education and regular classes. (Tr. 51). At the time of the hearing, he was in summer school for the second time, and could only read "a little." *Id.* She stated he had been held back in kindergarten and again in second grade. (Tr. 52). He was in the third grade at the time of the hearing. (Tr. 58). Patterson also noted he would be held back again (in third grade) if he did not pass a test at the end of the summer. (Tr. 52). She testified that he tries, but it is very hard for him to do his work. (Tr. 57).

After school he uses a computer at school, or plays in the school gym. (Tr. 45). He also plays computer games at home. (Tr. 46). He has "a couple" friends at school and in the neighborhood, though he sometimes gets frustrated and fights with them. (Tr. 47). He had been on the football team, but was no longer because of bad behavior. (Tr. 52). He spit in the water bottles because he was frustrated at not getting to play. (Tr. 53).

11

Patterson stated that Plaintiff "sometimes" keeps his room clean and "sometimes" takes out the trash. (Tr. 47). He bathes and showers, brushes his teeth, and dresses himself. (Tr. 48). He needed a lot of reminding to complete tasks around the house. (Tr. 53-54).

The medication Plaintiff takes helps "sometimes", though it affects his appetite and makes him "a little bit" tired. (Tr. 50, 56-57). He had been on psychiatric medication since he was five years old. (Tr. 54).

***ALJ Decision***

In a written decision dated July 23, 2014, the ALJ found Plaintiff was a school-age child on both the date the application was filed, and at the time of the hearing and had not engaged in substantial gainful activity since the date of the application. (Tr. 22). He found Plaintiff had severe impairments of ADHD, ODD, and history of learning disorder. *Id.* The ALJ then concluded Plaintiff did not have an impairment of combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. *Id.* He also concluded Plaintiff did not have an impairment or combination of impairments that functionally equaled the severity of the listings. (Tr. 23). In so doing, the ALJ found Plaintiff had less than marked limitation in acquiring and using information, attending and completing tasks, and caring for oneself. (Tr. 27, 28, 31). He found Plaintiff had no limitation in the functional domains of health and physical well-being, and moving about and manipulating objects. (Tr. 30, 32). He also found Plaintiff had marked limitation in interacting and relating with others. (Tr. 29). Because he concluded there was no new and material evidence of deterioration, the ALJ adopted the prior ALJ's findings in these domains. (Tr. 28-32). As a result, the ALJ concluded Plaintiff was not disabled, as defined by the Social Security Act. (Tr. 32).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.  Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a). A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

## DISCUSSION

Patterson presents two arguments: 1) the ALJ erred in adopting a prior ALJ's finding that Plaintiff's impairments did not functionally equal the severity of the listings because there was new and material evidence of a change in Plaintiff's condition; and 2) a sentence six remand is

14

required for the consideration of new and material evidence. The Commissioner responds that the ALJ did not err, and remand is not required.

### Drummond Rule

Prior decisions of the Commissioner which are not appealed are binding on a claimant and the Commissioner. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997). In *Drummond*, the Sixth Circuit held that the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new evidence or changed circumstances require a different finding. *Id*. at 842. Social Security Ruling 98-4(6) therefore mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 WL 283902, at *3.

It is the Plaintiff's burden to show that circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Jones v. Comm'r of Soc. Sec.*, 2015 WL 4394423, at *5 (N.D. Ohio) (quoting *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich.) *report and recommendation adopted*, 2011 WL 4502955 (E.D. Mich.)). Such evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Such evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988); *see also Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007) ("Because this is a case which

15

requires a showing of changed circumstances[,] . . . a comparison between the circumstances existing at the time of the prior decision and circumstances existing at the time of the review is necessary.") (citation omitted).

Patterson now contends that the ALJ's adoption of the prior ALJ's findings was improper because there was new and material evidence providing a basis for a different finding. Specifically, Patterson contends there was evidence of a worsening of Plaintiff's functional ability to acquire and use information due to his learning disorder. (Doc. 16, at 12-13). Within this argument, Patterson contends the ALJ did not consider all the evidence, and erred in relying on state agency physicians who did not review the entire record. Therefore, she argues, the ALJ's decision to adopt the findings of the prior ALJ is not supported by substantial evidence.

*Consideration of the Evidence*

Contrary to Plaintiff's contention, the ALJ here did review all the evidence. In fact, he specifically discussed and weighed much of the evidence Patterson now points to in support of her arguments: 1) reports from Plaintiff's teachers, 2) notes from Plaintiff's therapists; and 3) Plaintiff's 2014 IEP. First, Plaintiff points to the evidence from Ms. Buchanan, Plaintiff's second-grade teacher. The ALJ discussed Ms. Buchanan's observations from November 2012[1] and January 2013. (Tr. 25-26) (citing Tr. 180-89, 195-96). And there is substantial evidence to support the ALJ's conclusion that the reports from Ms. Buchanan were not substantially worse than those considered by the previous ALJ. For example, the previous ALJ noted a report from Plaintiff's kindergarten teacher that Plaintiff had serious problems with acquiring and using information, and attending and completing tasks (specifically that he generally required fifty percent more time to complete his work). (Tr. 71). That teacher also noted Plaintiff had been

---

1. The ALJ stated Ms. Buchanan's first questionnaire was completed in November 2013. (Tr. 25). This is incorrect, and it was completed in November 2012. *See* Tr. 189.

removed from first grade mid-year and placed back in her kindergarten class. *Id.* Similarly, Ms. Buchanan noted Plaintiff had serious problems with acquiring and using information and that his IEP allowed him extra time and other accommodations. (Tr. 195-96). She also noted Plaintiff was working below grade level. (Tr. 195) ("He is working at a kindergarten/first grade level."). At the beginning of his analysis of Ms. Buchanan's opinion, the ALJ explained that "[t]he observations of [Plaintiff's] teachers suggest no significant decrease in his functioning in the school environment since the prior decision." (Tr. 25). The ALJ then discussed Ms. Buchanan's opinion and concluded that it was "similar to those given during the prior period, suggesting that the claimant exhibited variable behavior based on mood, and had noticeable improvement when compliant with medication." (Tr. 26).

Although Plaintiff clearly struggles in school, the ALJ had substantial evidence to support his conclusion that those struggles were not materially different than they were at the time of the previous ALJ decision. As the ALJ pointed out, Plaintiff had not repeated any additional grades during the time period and his grades had remained stable with some improvement. (Tr. 28) (citing Tr. 238) (report card showing: 1) mainly grades of C and D, with more Cs in the third marking period than the first or second; and 2) promotion to fourth grade the following year). Additionally, the previous ALJ examined evidence that Plaintiff was performing at a kindergarten level while in the first grade. *See* Tr. 71 (ALJ's discussion of Plaintiff's teacher's report that Plaintiff "was 'clearly not on a first grade level'", had been sent back to kindergarten, and that even in that environment Plaintiff "generally required 50% more time to complete his work."); Tr. 72 (ALJ's discussion of May 2011 IEP analysis noting: 1) return to kindergarten from first grade; 2) "[e]ven with numerous interventions" the claimant was reading below grade level and his math and written expression skills were "very weak" and 3)

17

"[m]inimal academic progress ha[d] been advance[ed] [that] year"). Reports from the time period relevant to the instant case indicate similar below-grade-level performance. *See* Tr. 180-99 (report from Plaintiff's second grade teacher that he was performing at a Kindergarten or "late first grade" level); Tr. 243 (March 2014 IEP review (third grade) noting Plaintiff's reading skills were below the first grade level, and math skills were "at the beginning of the second grade level"); Tr. 261 (June 2014 report that Plaintiff was in third grade and "his functional level is at the 2nd grade level"). Test scores, similarly, were low during both time periods. *Compare* Tr. 72 (first ALJ decision discussing test results from May 2011 IEP evaluation showing low average intellectual functioning, and "academic achievement skills below grade level in all areas") *with* Tr. 220-26 (March 2012 IEP noting below average performance on math and reading tests); Tr. 241-47 (March 2014 IEP noting Plaintiff's test scores put him in the range of "limited").

Second, Patterson argues the opinion of Plaintiff's therapist that Plaintiff had a marked limitation in acquiring and using information is consistent with the opinions of his teachers. Again, the ALJ considered this evidence. (Tr. 26). The ALJ found the opinion as a whole was entitled to little weight as it "contained . . . overstatements of the claimant's functional limitations, including 'moderate' limitation in health and well-being and moving about and manipulating objects." (Tr. 26) (citing Tr. 469). The ALJ also noted the opinion "lacked objective support from the treatment records and is inconsistent with the progress demonstrated with medication compliance." *Id.* Notably, there is no objective indication in the record that Plaintiff had any limitation in moving about and manipulating objects. Lack of record support is a valid reason to discount an opinion, and thus the ALJ did not err in his evaluation of the therapist's opinion. *See* 20 C.F.R. § 416.927(c)(3)-(4); *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 584 (6th Cir. 2010).

Third, the ALJ also considered the 2014 IEP review Patterson now points to in support of her argument. *See* Tr. 27. In assessing Plaintiff's limitations in the area of acquiring and using information, the ALJ noted Plaintiff "has continued to require an IEP for special education services, but there is no evidence of a worsening that has required increased intervention. [Plaintiff] has not been held back in additional grades during this period, with 2nd grade being the last grade repetition in 2012." (Tr. 27-28). As discussed above, the ALJ had substantial evidence to support this determination. *See* Tr. 238 (report card showing: 1) mainly grades of C and D, with more Cs in the third marking period than the first or second; and 2) promotion to fourth grade the following year). The accommodations in the 2014 IEP were comparable to those in earlier IEPs. *Compare* Tr. 252-53 (2014 IEP noting Plaintiff would receive instruction for reading and math both the "general classroom and a resource room which will allow him for frequent direct instruction, monitoring and fewer distraction[s]" but would attends gym, art, library, music, social studies and science with his non-disabled peers); *with* Tr. 227 (2012 IEP noting Plaintiff would receive math and reading "in both special education and regular education settings, which allows for frequent, direct instruction, monitoring and fewer distraction[s]"; social studies and science would also be in a regular classroom; and he would attend gym, music, art, and library with his non-disabled peers) *and* Tr. 72-73 (prior ALJ's discussion of 2011 IEP noting Plaintiff qualified for special education services based on a specific learning disability and that "[a]cademic achievement testing revealed the claimant's academic skills were below grade level in all areas.").

Plaintiff is also correct that the ALJ found Plaintiff's learning disability to be a severe impairment, an addition to the previous ALJ's list of impairments. However, the previous ALJ, though not finding learning disability to be a severe impairment, recognized Plaintiff had

19

"continuously performed below grade level academically" and required an IEP for special education services for a "Specific Learning Disability." (Tr. 77). The current ALJ's decision also notes: "The undersigned finds that the claimant received an additional diagnosis of learning disorder during this period, which contributed to the claimant's functional difficulties, but did not cause greater limitations than those expressed in the prior ALJ decision." (Tr. 22). As discussed above, despite low grades, Plaintiff had not repeated any additional grades, and his grades remained stable. *See* Tr. 28 (ALJ's analysis the functional area of "acquiring and using information") (citing Tr. 238). Thus, substantial evidence supports the current ALJ's conclusion that this was also not a material change since the prior ALJ's decision.

After reviewing this evidence as discussed above (and more), the ALJ found he was bound by the decision of the prior ALJ, as there was no evidence of a material worsening of Plaintiff's condition. *See* Tr. 19, 22, 28, 30, 31, 32. This conclusion is supported by substantial evidence. Although one can also frame the evidence (as Patterson does) in a different light, this does not change the conclusion. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477 (6th Cir. 2003). The undersigned also notes that the question is whether Plaintiff satisfied the burden to show that circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Jones*, 2015 WL 4394423, at *5 (quoting *Drogowski*, 2011 WL 4502988, at *8). And whether the ALJ's decision that Plaintiff had not is supported by substantial evidence. *See Jones*, 336 F.3d at 477. The undersigned finds the ALJ's conclusion that Plaintiff had not satisfied that burden has the support of substantial evidence in the record.

Thus, the ALJ did not err in applying Ruling 98-4(6) and *Drummond* and adopting the findings of the previous ALJ.

*State Agency Physicians*

Plaintiff secondly contends the ALJ erred in relying on the opinions of state agency physicians who did not review the entire record. Specifically, Plaintiff contends that "[i]t does not appear that these opinions rendered in December 2012 and April 2013 were based on a review of the record that included a [sic] much of this evidence." (Doc. 16, at 18). The ALJ here stated he was giving "significant weight" to the opinion of the state agency reviewer as it was "consistent with the objective clinical evidence and education records, which demonstrate that the claimant has continued to have behavior difficulties, but has exhibited stable or improved symptoms since the prior decision." (Tr. 27) (citing Tr. 90-98).

The undersigned, however, agrees with the Commissioner that an ALJ may rely upon the opinion of a state agency physician, even if additional evidence post-dates that opinion. Agency regulations state that though ALJs "are not bound by any findings made by State agency medical or psychological consultants . . . [they] must consider findings and other opinions of State agency medical and psychological consultants . . . except for the ultimate determination about whether [Plaintiff] is disabled." 20 C.F.R. § 416.927(e)(2)(i). An ALJ may rely on a state agency reviewer who did not review the entire record, so as long as the ALJ also considers the evidence post-dating the opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Ruby v. Colvin*, 2015 WL 1000672, *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). In this case, it is clear from the ALJ's decision that he considered the state agency physician's opinions along with subsequent evidence. The ALJ recounted and analyzed evidence

from January 2012 through June 2014. (Tr. 24-30). And, as discussed above, the ALJ's decision as a whole—that Plaintiff had not shown a material deterioration in his condition from the time of the previous ALJ decision—is supported by substantial evidence.

***Sentence Six***

Patterson's second contention is that remand is required under sentence six of 42 U.S.C. § 405(g) in light of new and material evidence, namely, results of standardized testing performed in May 2014. The Commissioner responds that the evidence is neither new nor material, and that Patterson has not demonstrated good cause for her failure to submit the evidence earlier.

A claimant must establish two prerequisites before a district court may order a sentence six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483-84 (6th Cir. 2006). A claimant must show: 1) the evidence at issue is both "new" and "material"; and 2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding". 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996). Evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding". *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Evidence is material only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711. (6th Cir. 1988). The party seeking remand bears the burden of showing the two requirements are met. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Additionally, the Sixth Circuit takes "a harder line on the good cause test" requiring a claimant "give a valid reason for his failure to obtain evidence prior to the hearing." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (quoting *Oliver v. Sec'y of Health & Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).

22

Patterson attaches Plaintiff's March 2016 IEP which contains reference to testing results from May 2014, nearly two years earlier. She contends the evidence is "new" as it was "not available to Ms. Patterson at the time of the administrative hearing" and "material" because, she contends, it suggests greater limitations in the area of acquiring and using information than found by the ALJ. (Doc. 16, at 19). She also argues good cause is shown because the evidence was "not available" to her at the time of the hearing. *Id.* The Commissioner responds that although "Plaintiff asserts that she did not have access to the May 2014 test scores at the time of the hearing in July 2014, she offered no detail about when she first saw those test results, whether she could have requested them prior to the hearing, or why her attorney did not ask the ALJ to hold the record open in order to submit the results." (Doc. 18, at 15).

The undersigned agrees with the Commissioner that Patterson has not shown good cause, and thus a sentence six remand is not appropriate. The testing was completed nearly two months before the administrative hearing in this case. *See* Doc. 16-1, at 2 (indicating tests were administered on May 12, 2014); Doc. 16-1, at 3 (indicating an Evaluation Team Report containing the test scores was written on May 23, 2014); *See Brace v. Comm'r of Soc. Sec.,* 97 F. App'x 589, 592 (6th Cir. 2004) (claimant could not show good cause warranting remand under § 405(g) when he received medical test results after the hearing from tests conducted one week prior to the ALJ hearing). Even if Patterson had not yet been provided those results at the time of the hearing, the testing clearly had already been conducted, and there is no evidence in the transcript indicating Plaintiff's attorney requested that the record remain open until such time as other evidence could be added. *See Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (6th Cir. 1984) (good cause not shown when "the transcript of the hearing before the ALJ clearly indicat[ed] that counsel for the Appellant did not seek to have the record remain open until such

23

time as other evidence could be made a part of the record."); *Bass v. McMahon,* 499 F.3d 506, 513 (6th Cir. 2007) ("[P]laintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in and of itself shows a lack of good cause."); *see also Caplinger v. Colvin*, 2014 WL 4908954, at *5 (S.D. Ohio) ("Plaintiff has failed to show good cause for not obtaining the IQ test results earlier. First, at the conclusion of the hearing, Plaintiff and his counsel failed to request the ALJ to leave the record open so he could present additional evidence."). Patterson, therefore, has not shown "a reasonable justification for the failure to acquire and present the evidence before the ALJ" and thus cannot show good cause. *Foster*, 279 F.3d at 357.[2]

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI supported by substantial evidence. Accordingly the decision of the Commissioner is affirmed.

IT IS SO ORDERED.


 s/James R. Knepp II
United States Magistrate Judge

---

2. If Patterson believes Plaintiff's condition has deteriorated since the ALJ issued the Commissioner's decision on July 23, 2014—based on the 2016 IEP or other evidence—she remains free to file a new application for SSI benefits on Plaintiff's behalf.